Commonwealth *v.* Cooper et al., Appellants.

Argued October 2, 1928.

Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ.

*David Wallerstein,* and with him *Henry Temin, Allen S. Olmsted, 2nd,* and *Francis Fisher Kane,* for appellants.

*H. Eugene Heine,* Assistant City Solicitor, and with him *John H. Maurer,* Assistant District Attorney, *Augustus Trask Ashton,* City Solicitor, and *John Monaghan,* District Attorney, for appellee.

OPINION BY KELLER, J., March 1, 1929:

On Sunday, February 12, 1928, these appellants and eleven other persons were arrested by the police of Philadelphia for disorderly conduct, breach of the peace and violation of the Sunday laws. They were given a hearing the next day before Magistrate Fahnestock, who found them all guilty on all three charges and imposed a fine and costs on each of them. An appeal was allowed by the court of quarter sessions and the cases were heard de novo before Judge ALESSANDRONI who, after a painstaking examination, discharged all the defendants on the charges for breach of the peace and violation of the Sunday laws, and set aside the conviction of disorderly conduct as to eleven defendants, but found these appellants guilty of that charge and sentenced each of them to pay the costs and a fine of ten dollars. Separate appeals were taken to this court, but they may be considered together and disposed of in one opinion.

The discriminating action of the court below establishes that the appellants were not adjudged guilty of disorderly conduct because they persisted in holding a mass meeting after they had been refused a permit by the Superintendent of Police and had been notified that the police would not allow "the meeting to go on."

The advertised purpose of the meeting was to "Organize the Unemployed" to "Demand Work or Government Maintenance" and "To Protest Against the Brutal Indifference of the City and State Authorities." Some days prior to the date fixed for the mass meeting its organizers had called on the Superintendent of Police and asked for a permit to hold it, which the Superintendent had refused, informing them that a meeting of that kind would only bring there a number of unemployed under false pretenses and would attract the usual radical and communist following, and that in the interest of law and order and the prevention of possible breach of the peace, and particularly on Sunday, he would not permit the meeting.

Our attention has not been directed to any law of the Commonwealth or ordinance of the city which required the securing of a permit from the Superintendent of Police before this meeting could be held. We do not say that there is none, but only that none has been pointed out to us by the representative of the Commonwealth. We do not mean to hold that the city police head has not the inherent power in extraordinary conditions of tension and excitement to forbid and prevent the holding of a mass meeting, designed and intended to stir up public feeling to violent action; but there is no evidence of the existence of any grave or unusual conditions requiring such procedure at this time. The usual course was open to intervene and put a stop to the meeting if it developed into an unlawful assembly or threatened an actual breach of the peace.

On the other hand the organizers of this meeting were informed of the Superintendent's position in the matter in ample time to secure an adjudication by legal proceedings of the legality of his threatened ban, but took no steps to do so. This fact may shed some light on their subsequent conduct.

At the advertised time about fifteen persons were

gathered in the hall (second floor) when several police officers arrived and informed them that the meeting could not be held. Up to this time there was no crowd, no noise, no disorder, no disturbance. While the action of the police officers may not have been warranted, it was accompanied by no force, violence or circumstances calculated to produce a disturbance. But three of these appellants, the three men, went to the windows, threw them up, and "at the top of their voices," directed to the street, began abusing and reviling the mayor, the superintendent of police, and even the President, and created a disturbance to the annoyance of the peaceable residents nearby, which quickly attracted a crowd and blocked the streets with honking automobiles in every direction for several squares. As fast as the police put down the windows on one side of the hall, these appellants raised them on the other, and continued their loud cries and opprobrious epithets until a crowd was clamoring to get into the hall as a result of their boisterous and unseemly conduct. When following this demonstration other policemen arrived on the scene and undertook to prevent the crowd which had assembled in response to the appellants' actions from entering the hall, the two women appellants went downstairs and "hollering" from the steps in a noisy and disorderly manner obstructed the police and incited the crowd to break past them into the hall. The crowd that had gathered in the meantime (about 700) was disturbing to the peace and good order of the neighborhood and prevented the flow of traffic in the streets in any direction; and the police accordingly made the arrests abovementioned including these five appellants.

Assuming, without deciding, that the action of the police in entering the hall and forbidding the meeting, before there was any actual disturbance or imminent breach of the peace, was illegal, it was not the imme-

diate cause of the demonstration which disturbed the peace and quiet of the neighborhood and annoyed the traveling public. That was occasioned by the noisy, boisterous, and disorderly conduct of these appellants following the action of the police. The illegal action of the police, assuming it was illegal, furnished no justification or excuse for a disorderly demonstration such as these appellants resorted to. There was a legal and orderly way of determining the legality of the police's action; but these appellants wanted none of it. They were apparently desirous of the outcome which resulted. They secured the crowd which otherwise they would not have had, and obtained the arrests for which they were clamoring. While they had a right to protest against the unwarranted action of the police, they could not do so in such a manner as to make themselves disturbers of the peace and good order of the neighborhood. The justice of their protest against the police will not excuse or condone the disorderliness of their subsequent conduct and the consequent annoyance to the neighborhood and the traveling public. One may protest against the actions of a policeman who unwarrantedly tells him to "move on;" but he must do it in such a way as not to create a public disturbance or amount to disorderly conduct.

Our function, in appeals of this character, is not to retry the case but to determine whether there is evidence to sustain the conviction. A review of the evidence, summarized as above, satisfies us that there was. See Act of May 2, 1901, P. L. 132.

The judgment in each case is affirmed; and it is ordered that the defendants appear in the court below at such time as they may be there severally called and that they be by that court committed until their respective sentences are complied with.