460 A.2d 1155

**COMMONWEALTH of Pennsylvania**

v.

**David E. BROWN, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 4, 1982.

Filed May 13, 1983.

312

Daniel McGee, Public Defender, Bellefonte, for appellant.

314

David Edward Grine, District Attorney, Bellefonte, for Commonwealth, appellee.

Before SPAETH, ROWLEY and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from judgments of sentence for escape and theft. Appellant was sentenced to imprisonment for a period of from two to four years for escape and from six months to one year for theft, the sentences to be served concurrently. He was also ordered to make restitution and to pay the costs of prosecution. On appeal, appellant argues that the verdicts were contrary to the evidence and contrary to the weight of the evidence, and that the sentence he received was manifestly excessive. We affirm.

Appellant and his co-defendant, Charles O. McKahan, escaped from the Rockview State Correctional Institution on December 15, 1980. As we shall discuss in some detail in a moment, appellant claims that he escaped to avoid being homosexually attacked by other inmates. On the day of the escape he told McKahan of his plan to leave and McKahan decided to accompany him. After leaving the prison the escapees made their way through a wooded area, and after about five hours, being tired and cold, they came upon an unoccupied cabin. They entered the cabin through the unlocked door, made a fire, and removed some of their clothes and placed them near the fire to dry. Appellant put on a green jacket that was hanging in the cabin. Appellant and McKahan took some cereal from a cupboard and some gauze bandages from a medicine cabinet to wrap their feet in. Appellant fell asleep for a short time and was awakened by McKahan telling him that someone had arrived at the cabin. The two then jumped out of a window and rolled down a hill outside the window. They proceeded about a mile, and after hearing their names called by personnel from the prison, they kept running. They were apprehended a short time later, N.T. 127–35, and were charged with escape, burglary, and theft. The jury acquit-

ted them of burglary but convicted them of escape and theft.

–1–

Appellant admits that he escaped from the Rockview State Correctional Institution [1] but he argues first that the evidence was insufficient to convict him of escape because the Commonwealth failed to disprove the defense of duress beyond a reasonable doubt. He claims that the defense of duress is available to him because of the threats of homosexual attack that other inmates at the prison made to him.

The defense of duress is defined as follows:

It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

18 Pa.C.S.A. § 309(a).

The Commonwealth does not argue that appellant failed to make out a claim of duress and we therefore do not express an opinion on whether, based on the evidence appellant presented, he should have been permitted to argue the defense of duress to the jury.

In reviewing the sufficiency of the evidence, we must accept as true all the evidence that supports the Commonwealth, and give the Commonwealth the benefit of all reasonable inferences from that evidence, and then determine whether, when so regarded, the evidence is sufficient to prove beyond a reasonable doubt that appellant was guilty of the crimes charges. *See, e.g., Commonwealth v. Smith*, 484 Pa. 71, 73–74, 398 A.2d 948, 949 (1979); *Commonwealth v. Boyd*, 463 Pa. 343, 347, 344 A.2d 864, 866 (1975).

**1.** The crime of escape is defined as follows:

A person commits an offense if he unlawfully removes himself from official detention or fails to return following temporary leave granted for a specific purpose or limited period.

18 Pa.C.S.A. § 5121(a).

Appellant testified that almost from the time of his arrival at the prison, in late July 1980, a group of inmates threatened him with homosexual rape if he failed to respond to their advances, and that his reason for escaping was that he "just couldn't take it any more." N.T. 152.

Appellant testified that except for one incident, described below, the threats were oral. Appellant testified, for example, to an incident that occurred in the "chow hall":

They saw me get up. They got up. Two of them got up before I did and went to the door. The other two said, "Look, you're going to have to think about this seriously. We [are] either going to take it or you're going to give it. We can get to you wherever you're at."

. . . .

They said, "You're either going to give it to us or we'll [*sic*] going to kill you. Or you'll die with us taking it." N.T. 139–40.

A similar threat was made some time later outside the prison library. N.T. 140.

Appellant stated that he was not "really concerned a whole lot after the first time they talked to me because I figured, 'They can't get to me. I'm in C-Block and the guards would know if they tried to get me in there.' " N.T. 138–39. The prisoners who had made the advances were housed in the East and West Wings, which were some distance from C-Block. N.T. 138. About October 23, 1980, however, a prison official, Sergeant Kramer, notified appellant that his job assignment was to be changed and that the change would require appellant to move to the East Wing. N.T. 141. Appellant testified:

[A] sergeant named Kramer came to me and said, "David, you're going to have to move." I said, "I won't move. Can't you do anything about this?" He said he couldn't. He said, "I'm giving you a direct order as of this time to get your bedding and move to the wing." I said, "What's my alternative?" He said, "Well you can lock yourself in your cell and refuse to come out. And you'll get a misconduct and you'll have to explain it to the board." I

said, "Well, I'm going to my cell. You can tell them I'm there. I'm not moving."

I was in my cell about two hours. Sergeant Kramer came and got me and took me to see—I thought I was going to see the P.R.C. board, Program Review Committee, but he took me to Mr. Harter's office.

At first I didn't know what to tell Mr. Harter. He said, "What's the problem?" I said, "I refuse to move. I have enemies over there. They'll get me." He said, "Maybe we'll move you to the East Wing instead of the West Wing." I said, "I have enemies there too." The building's connected and it's hard to get into from one end to the other.

I said, "I'm not going to go over there. I only have four months to go before I get paroled. I've been in jail for a year and I have no problems or no write-ups."

It was put across to me that if I didn't go, I wouldn't make parole because I would get a write-up.

On both cross-examination and on rebuttal appellant testified that he had been "written-up" for asking that he not be transferred. He was told later, however, that the write-up was not in his prison record. N.T. 157, 207–09. He said that Mr. Harter told him that if he would move to the East Wing or West Wing, the write-up would be torn up and not made part of his record. N.T. 208. Sergeant Kramer, testifying on rebuttal, denied having written a misconduct slip. He further denied that appellant had asked him not to move him to the East or West Wing, and he stated that appellant had not complained to him that he was experiencing sexual pressures or threats of abuse. N.T. 198–99, 201. Mr. Harter, also testifying on rebuttal, stated that appellant had never complained to him of sexual pressures or threats of abuse. N.T. 185.

Appellant moved to the East Wing. He testified that as soon as he arrived, members of the group that had been threatening him offered him favors in exchange for sex, N.T. 142–43, and that he then went back to see Mr. Harter and told him:

"Look they've already approached me. I'm going to get killed or I'm going to have to defend myself and hurt somebody. I don't want to come into jail doing 1½ to 3 and end up doing life or be dead."

N.T. 143.

When Mr. Harter responded, "Well, try it again and see if it works out," N.T. 144, appellant began "taking lay-ins,"—reporting ill to the infirmary and receiving permission to take meals in his cell, and bathing in his cell. *Id.* On one occasion, about one week before appellant escaped, and while he was "laying in," a prisoner came in and grabbed his "privates." N.T. 145–46. (This is the incident mentioned above that was not oral.) Appellant did not, however, explain to the infirmary staff the reasons for his wanting "lay-ins," but instead, he complained of physical problems. N.T. 156. He testified that he had told the prison chaplain of his fears, N.T. 155, but the chaplain did not testify at trial. Appellant also testified that a fellow inmate, Nathan Clark, knew of the difficulties he was having and "had stepped in a few cases and told these people 'Look, you've got to leave this guy alone.'" N.T. 154–55. Clark himself testified, and said that he was friendly toward members of the group and had told them not to harm appellant. N.T. 167.

On cross-examination appellant was asked about the complaint procedures at Rockview:

Q. Is there a complaint procedure at Rockview whereby you could have filed a complaint against these inmates through Mr. Biviano?

A. Through Mr. Biviano? I had put in complaints prior to that to him about other matters. I don't remember what they are at this time. But I had got no satisfaction.

Mr. Harter is the one in the Institution to see if you're having problems and you need your housing changed. I went to him as told and I got no help.

I couldn't very well walk up to the warden and approach him.

Q. Did you report it to any other official, such as the major of the guard, Lieutenant Parks?

A. No I didn't.

*      *      *      *      *      *

Q. So when they refused to give you the lay-ins, it wasn't because they were refusing on the grounds that they knew you had pressure; it's just that you weren't telling them what the real situation was.

A. To the medical officers, no.

■■■■ As with all evidence presented at trial, when evidence of a defense is presented, the jury is free to believe it in its entirety or to disbelieve all or portions of it. *Commonwealth v. Tate*, 485 Pa. 180, 401 A.2d 353 (1979); *Commonwealth v. Yost*, 478 Pa. 327, 386 A.2d 956 (1978); *Commonwealth v. Greene*, 469 Pa. 399, 366 A.2d 234 (1976). In evaluating the evidence of the defense, the jury is not confined to that evidence; it may conclude that when the evidence of the defense is considered with all the other evidence, the defense has not been established and the defendant is guilty of the crime charged beyond a reasonable doubt. *Commonwealth v. Fairell*, 476 Pa. 128, 381 A.2d 1258 (1977). Here, we are not persuaded by appellant's argument that the Commonwealth failed to disprove the defense of duress beyond a reasonable doubt.

■■■ We note first that the lower court instructed the jury that for duress to be a defense to the charge of escape four requirements must be met: the escapee must be confronted with a specific threat of death or serious bodily injury; there must either be no time to complain to authorities, or a history of futile complaints; there must be no evidence of force by the escapee against prison personnel or others in the escape; and the escapee must return to official detention as soon as possible after leaving the prison. N.T. 241. Appellant has not claimed error in the instruction, and we find that it comports with the requirements set forth in *Commonwealth v. Clark*, 287 Pa.Super. 13, 429 A.2d 695 (1981), and *Commonwealth v. Stanley*, 265 Pa.Super. 194,

401 A.2d 1166 (1979), *aff'd* 498 Pa. 326, 446 A.2d 583 (1982). *See also Commonwealth v. Boone,* 287 Pa.Super. 1, 429 A.2d 689 (1981).[2]

The record reveals that appellant was not prompted to escape by a specific threat of attack. His testimony suggests that the most recent incident that occurred prior to his escape occurred about a week before. The jury may have concluded that although the threats appellant had experienced were real and serious, appellant had not done all that he might have to avoid them.

Or the jury may have concluded that appellant had not experienced the threats he said he had. Appellant's own testimony suggests that his complaints to Sergeant Kramer and Mr. Harter were vague at best. He told them that he "[had] enemies over there" *i.e.,* in the East and West Wings. After he had moved to the East Wing, he told Mr. Harter, "Look they've already approached me. I'm going to get killed ...." The Commonwealth's evidence, which we are bound to accept, is that appellant was not specific in stating his reason for asking that he not be moved from C-Block, and appellant, by his own testimony, admits that when he requested "lay-ins" after he was transferred to the East Wing, he gave health problems as the reason for such requests and never disclosed that he wanted to remain in his cell because he feared for his safety. Appellant also admits that he never complained to Mr. Biviano, the person at the prison with whom complaints were to be lodged, nor

2. In each of these cases we held that the defense of duress was not available to the escapee, principally because the escapee had not "return[ed] to official detention as expeditiously as possible after absenting himself from the danger that initially prompted his escape." *Commonwealth v. Stanley, supra* 265 Pa.Super. at 206, 401 A.2d at 1172. In *Stanley* we cited *People v. Lovercamp,* 43 Cal.App.3d 823, 118 Cal.Rptr. 110 (1974), with approval. *Commonwealth v. Stanley, supra* 265 Pa.Super. at 206, 401 A.2d at 1172. In *Lovercamp,* the court listed five factors that must be considered in deciding whether duress has been shown—the four factors included in the lower court's instruction, and whether the escapee had time or opportunity to resort to the courts.

did he make his fears known to the warden. It is true that appellant testified that he did not complain to Mr. Biviano because his complaints on other matters had gone unresolved, but the fact remains that appellant failed to bring his fear of homosexual assault to the attention of the prison official charged with addressing prisoners' complaints.

Finally, appellant's actions following his escape were not consistent with his claim that he planned to turn himself in to authorities. When appellant and McKahan became aware that they were being followed by a search party, they continued to elude the authorities.

On this record we conclude that the jury could find that the Commonwealth met its burden of disproving the defense of duress beyond a reasonable doubt.

–2–

Appellant next argues that the evidence was insufficient to convict him of theft because the Commonwealth failed to establish that he intended to deprive the owners of the items he took from the cabin. Appellant admits that he exercised control over the property of another without permission. *See* 18 Pa.C.S.A. § 3921(a). With respect to the green jacket, however, he claims that he left the cabin wearing it only because he was surprised by the arrival of the owner of the cabin. Nevertheless, the jury was entitled to conclude that the manner in which appellant left the cabin and the fact that he was then in the course of a prison escape made it "unlikely that the owner [would] recover [the jacket]," 18 Pa.C.S.A. § 3901(2), and that the Commonwealth had established intent to deprive in connection with appellant's taking of the jacket. The same may be said regarding the bandages and the cereal. We shall not consider appellant's contention that these latter items were taken out of necessity, for he did not argue the defense of necessity below.

–3–

Appellant next argues that the verdict is contrary to the weight of the evidence. In *Commonwealth v. Zapata,* 447 Pa. 322, 327, 290 A.2d 114, 117 (1972), the Supreme Court stated:

> The grant of a new trial on the ground that the verdict is against the weight of the evidence is committed to the sound discretion of the trial court. *Commonwealth v. James,* 197 Pa.Superior Ct. 110, 113–14, 177 A.2d 11, 13 (1962); cf. *Commonwealth v. Swanson,* 432 Pa. 293, 298, 248 A.2d 12, 15 (1968). Where the evidence is conflicting, the credibility of the witnesses is solely for the jury and if its finding is supported by the record, the trial court's denial of a motion for new trial will not be disturbed. *Commonwealth v. Hayes,* 205 Pa.Superior Ct. 338, 344, 209 A.2d 38, 41 (1965); cf. *Commonwealth v. Rankin,* 441 Pa. 401, 404, 272 A.2d 886, 887 (1971).

Here, as to the conviction for escape, there was a conflict in the testimony given by appellant and the prison officials as to whether appellant had informed them of the threats that had been made against him. The jury evidently chose to believe the testimony of the prison officials over that of appellant. The jury was entitled to do that. As to the conviction for theft, appellant admitted taking the items from the cabin.

–4–

Finally, appellant argues that the sentence he received, though within statutory limits, was manifestly excessive and that the lower court abused its discretion in imposing it. He argues that the sentencing court should have considered the threats of sexual abuse that led him to escape from the prison, and the fact that the items he took from the cabin were taken "out of dire necessity, given the harsh weather conditions on the day of his escape." Brief for Appellant at 19.

■■■ Under the Sentencing Code, 42 Pa.C.S.A. § 9721, the sentencing court must consider the individual background of the defendant and the circumstances of the offense, and impose such sentence as represents the minimum punishment consistent with the protection of the public, the seriousness of the offense, and the rehabilitative needs of the defendant. *See, e.g., Commonwealth v. Edrington,* 490 Pa. 251, 416 A.2d 455 (1980). When the sentence is within statutory limits, and the court has complied with the several requirements of the Sentencing Code, such as stating its reasons for the sentence, we will not reverse absent a manifest abuse of discretion. *See, e.g., Commonwealth v. Green,* 494 Pa. 406, 431 A.2d 918 (1981).

■■■ At the sentencing hearing the court reviewed a presentence investigation report. The court stated that in imposing sentence it was considering the circumstances of appellant's background, including his education and his history of criminal activity, and "the other facts concerning you." N.T. Sentencing 15–16. The court also referred to a drug problem appellant had and stated its view that treatment could best be provided for him in the state prison system, rather than at the county jail, as appellant had requested. N.T. Sentencing 17–18. The court stated its belief that appellant, in escaping, chose an inappropriate way of showing his concern for his own well-being. N.T. Sentencing 16. The court acknowledged the difficulty presented the penal system by appellant's fears of attack, and it expressed concern as to "how best to help Mr. Brown so that he does not go back on the street as ... he came in off the street." N.T. Sentencing 12. The court considered alternatives to total confinement but rejected them, concluding that the seriousness of the offenses called for total confinement. On this record of the sentencing hearing we cannot say that the court abused its discretion in sentencing appellant.

Affirmed.